**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LEANN IOSELLO,                                  )
individually and on behalf of a class,          )
                                                )
            Plaintiff,                          )
                                                )
      v.                                        )      08 CV 2329
                                                )      Judge Der-Yeghiayan
GAMERS PARADISE, INC.,                          )      Magistrate Judge Cole
and DOES 1-10,                                  )
                                                )
            Defendants.                         )

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Plaintiff respectfully requests that this Court enter an order determining that this action

alleging violation of the Fair and Accurate Credit Transactions Act ("FACTA") be certified as a

class action.

Plaintiff defines the class as "all persons to whom defendants provided an electronically

printed receipt at the point of sale or transaction, in a transaction occurring in Illinois after

December 4, 2006, which receipt displays either (a) more than the last five digits of the person's

credit card or debit card number, or (b) the expiration date of the person's credit or debit card, or

(c) both."

Plaintiff further requests that Edelman, Combs, Latturner & Goodwin, LLC be appointed

one of the counsel for the class.

In support of this motion, plaintiff states as follows:

**NATURE OF THE CASE**

1.      One provision of FACTA, codified as 15 U.S.C. §1681c(g), provides that

**No person that accepts credit cards or debit cards for the transaction of
business  shall print more than the last 5 digits of the card number or the
expiration date upon any receipt provided to the cardholder at the point of
sale or transaction.**

2.      15 U.S.C. §1681c(g) is not ambiguous.  "The plain meaning of the statute is that a

1

merchant shall not print more than the last 5 digits of the credit card number upon any receipt and a merchant shall not print the expiration date upon any receipt. In other words, a retailer must print no more than five digits of a card number, and a retailer must also remove the expiration date from the credit card receipt. Printing either more than five digits of the credit card number or the expiration date of the credit card violates Section 1681c(g)." *Iosello v. Leiblys, Inc.*, 502 F.Supp.2d 782, 786 (N.D.Ill. 2007); *accord*, *Follman v. Hospitality Plus of Carpentersville, Inc.*, 532 F.Supp.2d 960, 963 (N.D.Ill. 2007), and *Cicilline v. Jewel Food Stores, Inc.*, _____ F.Supp.2d _____, 2008 U.S. Dist. LEXIS 29501 (N.D.Ill. Mar. 31, 2008) (rejecting claimed affirmative defenses based on First Amendment grounds).

3.      On November 21, 2007, plaintiff received from Gamers Paradise, Inc. at its establishment located at Gurnee Mills, Gurnee, Illinois, a computer-generated cash register receipt which displayed more than the last 5 digits of plaintiff's card.

4.      15 U.S.C. §1681c(g) is an essential protection against identity theft, which according to the Federal Trade Commission victimized some 9 million persons and caused over $57 billion in harm in 2006 alone. "Stevens ID Theft Prevention Act Passes Commerce Committee," States News Service, Apr. 25, 2007 (Exhibit A). One common *modus operandi* of identity thieves is to collect lost or discarded credit card receipts, or steal them, and use the information on them to engage in fraudulent transactions. Identity thieves who do this are known as "carders" and "dumpster divers." This is more common than the use of sophisticated electronic means to obtain the information. Robin Sidel, "Identity Theft – Unplugged – Despite the High-Tech Threat, When You Get Ripped Off It's Usually Still the Old Way," *Wall Street Journal*, Oct. 5, 2006, p. B1 (Exhibit B).

5.      To curb identity theft, Congress prohibited merchants who accept credit cards and debit cards from issuing electronically-generated receipts that display either the expiration date or more than the last five digits of the card number. The law gave merchants who accept credit and debit cards up to three years to comply. Full compliance was required by December 4, 2006.

2

6.      The need to "truncate" receipts was widely publicized among retailers.  For example, the CEO of Visa USA, Carl Pascarella, explained on March 6, 2003 that "Today, I am proud to announce an additional measure to combat identity theft and protect consumers.  Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts.  The card's expiration date will be eliminated from receipts altogether.... The first phase of this new policy goes into effect July 1, 2003 for all new terminals...." "Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft; Visa CEO Announces New Initiative at Press Conference With Sen. Dianne Feinstein," PR Newswire, March 6, 2003 (Exhibit C).

7.      The August 12, 2006 edition of "Rules for Visa Merchants" (Exhibit D, p. 62), which is binding upon all merchants that accept Visa cards,  similarly makes clear that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all."  VISA required complete compliance by merchants accepting Visa card by July 1, 2006, five months ahead of the statutory deadline. (Id.)

8.      Most of defendants' business peers and competitors readily brought their receipt printing process into compliance.

9.      A private remedy is provided by 15 U.S.C. §1681n, which provides as follows:

**§1681n.  Civil liability for willful noncompliance**

**(a) In general.  Any person who willfully fails to comply with any requirement imposed under this title [15 USC §§1681 et seq.] with respect to any consumer is liable to that consumer in an amount equal to the sum of–**

> **(1)**
>
> > **(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $ 100 and not more than $ 1,000...**

**CLASS CERTIFICATION REQUIREMENTS**

10.     All requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil  Procedure

have been met.

11.     On information and belief,  there are over 100 persons to whom defendants provided an electronically printed receipt at the point of sale or transaction, in a transaction occurring in Illinois after December 4, 2006, which displays either (a) more than the last five digits of the person's credit card or debit card number, or (b) the expiration date of the person's credit or debit card, or (c) both.  Defendants operate a retail store which, approximately twelve months after the effective date of 15 U.S.C. §1681c(g), issued non-compliant receipts to plaintiff.  The retail store is a part of a chain of stores in the Chicagoland area.  Therefore, it can reasonably be concluded that more than 100 non-compliant receipts were issued by defendants during the class period. (Exhibit E.)

12.     Plaintiff will obtain the exact number of class members through discovery, and requests a briefing schedule long enough to obtain such information.

13.     There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members.  The predominant common questions include the following:

a.     Whether defendants had a practice of providing customers with a sales or transaction receipt on which defendants printed more than the last five digits of the credit or debit card, or the expiration date of the credit or debit card, or both;

b.     Whether defendants thereby violated FACTA; and

c.     Whether defendants' conduct was willful.

14.     Plaintiff's claims are typical of those of the class members.  All are based on the same factual and legal theories.

15.     Plaintiff will fairly and adequately represent the class members.  Plaintiff has no interests that conflict with the interests of class members. Plaintiff has retained experienced counsel. (Exhibit F.)

16.     A class action is superior for the fair and efficient adjudication of the class

4

members' claims, in that:

        a.      Consumers are unlikely to recognize the violation; and

        b.      Individual actions are uneconomical.

17.     Courts have recently held that actions alleging willful FCRA violations and seeking statutory damages are appropriate for class resolution.  *Cicilline v. Jewel Food Stores, Inc.*, _____ F.Supp.2d _____, 2008 U.S. Dist. LEXIS 29505 (N.D.Ill. Mar. 31, 2008), *Matthews v. United Retail, Inc.*, 2008 U.S. Dist. LEXIS 17217 (N.D.Ill. Mar. 5, 2008), *Harris v. Circuit City Stores, Inc.*, 2008 U.S. Dist. LEXIS 12596 (N.D.Ill. Feb. 7, 2008), *Halperin v. Interpark, Inc.*, 2007 U.S. Dist. LEXIS 87851 (N.D.Ill. Nov. 29, 2007).

18.     In further support of this motion, plaintiff submits the accompanying memorandum of law.

WHEREFORE, plaintiff respectfully requests that this Court enter an order determining that this action may proceed as a class action.

                       Respectfully submitted,


                       s/ Thomas E. Soule
                       Thomas E. Soule

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Thomas E. Soule
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

STEVENS ID THEFT PREVENTION ACT PASSES COMMERCE COMMITTEE States News Service April 25, 2007
Wednesday

14 of 257 DOCUMENTS

Copyright 2007 States News Service
States News Service

April 25, 2007 Wednesday

**LENGTH:** 351 words

**HEADLINE:** STEVENS ID THEFT PREVENTION ACT PASSES COMMERCE COMMITTEE

**BYLINE:** States News Service

**DATELINE:** WASHINGTON

**BODY:**

The following information was released by Senate Committee on Commerce, Science and Transportation:

The Senate Committee on Commerce, Science and Transportation today passed S. 1178 the "**Identity Theft Prevention Act.**" Committee Vice Chairman Senator Ted Stevens (R-Alaska) introduced the legislation and it is cosponsored by Commerce Committee Chairman Daniel Inouye (D-Hawaii), Senator Gordon Smith (R-Ore.) and Senator Mark Pryor (D-Ark.) and Senator Bill Nelson (D-FL). This bill would strengthen information safeguards and ensure notification to consumers whose sensitive personal information has been acquired without authorization. The bill would also direct the **Federal Trade Commission** (FTC) to enforce rules to protect such information. Under the bill, consumers would be able to freeze their credit for a reasonable fee to protect themselves from **identity theft.** The bill now moves to the Senate where it awaits consideration.

"ID theft is a growing problem that plagues Americans in the far reaches of our nation and everywhere in between," said Senator Stevens. "Studies of **identity theft** show that Alaskans are particularly susceptible to this criminal activity. It is time for Congress to act. We must take steps to help people protect themselves. I urge the Senate to take up this bill, which has received broad bipartisan support, and pass it quickly."

**Identity theft** has risen dramatically nationwide over the past decade and the FTC estimates that each year nearly **9 million** Americans - or roughly 4.6 percent of the domestic adult population - are victimized by identity thieves. The FTC indicates that physical and online **identity theft** accounted for 40 percent of the more than 616,000 consumer fraud complaints filed last year with the agency. The costs associated with **identity theft** are enormous. In 2006, it is estimated that the losses to businesses and financial institutions due to **identity theft** totaled $52.6 billion, and the out-of-pocket losses to consumers totaled $5 billion, which does not take into account the average 300 hours spent by each victim to restore their good name.

**LOAD-DATE:** April 26, 2007

EXHIBIT

*A*

Bloomberg No. 5309

Identity Theft -- Unplugged --- Despite the High-Tech Threat, When You Get Ripped Off It's Usually Still the Old Way
The Wall Street Journal October 8, 2005 Saturday

7 of 14 DOCUMENTS

Copyright 2005 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



**factiva.**

(Copyright (c) 2005, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

October 8, 2005 Saturday

**SECTION:** Pg. B1

**LENGTH:** 1438 words

**HEADLINE:** Identity Theft -- Unplugged --- Despite the High-Tech Threat, When You Get Ripped Off It's Usually Still the Old Way

**BYLINE:** By Robin Sidel

**BODY:**

WORRIED THAT shadowy gangs of Russian hackers are breaking into computer networks, stealing your financial secrets? Don't lose too much sleep over it.

But you might want to hide your checkbook when friends and relatives come visit your home.

Despite a series of alarming reports in recent months about security breaches that have made personal data potentially vulnerable to crooks -- such as the one at credit-card processor CardSystems Solutions Inc. affecting 40 million credit-card accounts -- most bank-related crimes remain stubbornly low-tech. They range from simple forgery of a check, to unauthorized credit-card use, to Dumpster-diving, which is when someone plucks a bank statement or credit-card bill from your garbage.

And the perpetrator probably may not be a stranger.

According to one recent study, by Javelin Strategy & Research, a consulting firm in Pleasanton, Calif., in 26% of all cases the fraud victims knew the person who had misused their personal information. (Typically it was a family member, friend or neighbor, or in-home employee.) In addition, as much as 50% of debit-card fraud occurs when a card is snagged by a family member or friend who knows the card's personal-identification number, according to a recent report from TowerGroup, a unit of MasterCard International Inc.

The term "identity theft" is often used loosely to describe a wide array of crimes. But true identity theft occurs when someone uses stolen information to create a new form of identity, such as opening a new credit-card account under the victim's name. That differs significantly from other kinds of bank fraud, such as when a criminal uses a stolen ATM card to get cash out of a teller machine.

Whether it's full-blown ID theft or small-scale fraud, even in cases where the criminal is a stranger, it's almost never a case of sophisticated computer hacking. Although 75% of all households use the Internet and 65% of those do some online banking, "most criminals obtain personal information through traditional rather than electronic channels," according to the Javelin study. Some 29% of victims surveyed said their personal information was obtained through a lost or stolen wallet, checkbook or credit card.

According to the study, the bulk of the rest were attributed to friends and relatives, corrupt employees, stolen mail, Dumpster-diving, and computer spyware. Computer viruses or hackers accounted for only 2.2% of incidents. While



EXHIBIT

B

Identity Theft -- Unplugged --- Despite the High-Tech Threat, When You Get Ripped Off It's Usually Still the Old Way
The Wall Street Journal October 8, 2005 Saturday

there has been a significant increase in the number of electronic attempts at **identity theft**, "the ones that are working are the traditional ones," said James Van Dyke, Javelin's president.

The Federal Trade Commission itself defines **identity theft** broadly, describing it as when someone possesses or uses a person's personal or financial information without their knowledge with the intent of committing fraud or other crimes.

The commission estimates that **identity theft** affects nearly 5% of the adult population, costing businesses and individuals a combined $53 billion annually. It received 246,000 reports of **identity theft** last year, nearly triple the number received in 2001. The FTC has attributed much of that rise to heightened awareness of the issue among consumers, making them more likely to report incidents as **identity theft.**

Overall, statistics on **identity theft** are spotty. For one thing, research has found that most victims of **identity theft** don't report the crime to police. In many cases, they aren't even certain that they are truly crime victims and don't know how the incident occurred. Banks increasingly alert authorities when incidents occur, but even those disclosures can be incomplete.

There are a number of steps individuals can take to protect themselves.

Many financial institutions are increasingly urging their clients to start using paper shredders at home. Household models can be relatively inexpensive, and they significantly reduce the chances that a criminal can find any useful personal information in the trash. Banks typically recommend shredding documents that contain account information, Social Security numbers, credit-card and ATM receipts and credit-card offers. Also, shred blank checks that sometimes come in the mail as part of a solicitation.

Another suggestion: Be particularly aware if credit-card bills or bank statements are missing from the mailbox. If a bill arrives more than two weeks late, the American Bankers Association suggests contacting the local post office to be sure it isn't being forwarded without the recipient's knowledge. Also check with the company where the bill originated.

It's also wise to avoid disclosing any personal information on forms or applications unless absolutely necessary, says Mike Cunningham, senior vice president in the credit-card fraud department at J.P. Morgan Chase & Co.

As an example, Mr. Cunningham says, he was recently filling out an application to be a coach on his son's neighborhood football team in Arizona, and the form asked for his social security number, driver's license number and other personal information. He declined to provide the information, because there was no way for him to know whether his personal information would be kept under lock and key.

"I just told the team mom that I didn't see why they needed it -- it was the perfect amount of information for an identity thief," he said. He got the job anyway.

The only organizations you're required to provide with your social security number are your employer and your financial institutions. (This is for tax purposes.) If anyone else asks -- say, a retailer -- you don't have to give it. The company can decline to provide the service, but it's worth asking what other identification they might accept instead.

Amid the proliferation of old-fashioned fraud, some financial institutions are fighting back by urging their customers to abandon paper statements altogether and instead view their accounts online. Among them is E*Trade Financial Corp., which says its online system is more secure than paper statements that can be stolen or copied. A spokeswoman declined to specify how much money the company will save by eliminating the printing and mailing of paper statements.

Banks are having a particularly tough time battling one of the oldest and most common kinds of crime: check fraud. Attempts of check fraud rose to $5.5 billion in 2003 from $4.3 billion in 2001, according to the American Bankers Association. The incidents resulted in losses of $677 million, representing a slight decline from $698 million in 2001; the trade group attributed the drop to better fraud-detection methods.

That slight decline isn't so reassuring to Lee Roberts, senior vice president at National Penn Bancshares Inc., a regional bank based in Boyertown, Pa. As recently as the past few weeks, the bank has been hit by a wave of incidents in which criminals have copied checks and then altered them for fraudulent use. That practice "has been around for seven or eight years," says Mr. Roberts. But as photocopiers and image-manipulation computer software become more sophisticated, he says, "they're getting better at it."

---

Identity Theft -- Unplugged --- Despite the High-Tech Threat, When You Get Ripped Off It's Usually Still the Old Way
The Wall Street Journal October 8, 2005 Saturday

### Battling Identity Theft

Despite all the buzz about high-tech online **identity theft**, most instances revolve around old-fashioned fraud such as forging a signature on a check. Here are steps for reducing the risk:

-- Check up on yourself regularly
Get a copy of your credit report every year from each of the major credit bureaus (TransUnion, Equifax, Experian) to make sure the records are accurate. Also, closely review all monthly bank and billing statements for discrepancies.

-- Travel light
Avoid carrying around credit-card or personal documents unless you really need them.

-- Keep personal data under wraps
Don't share personal ID numbers or passwords with anyone. Don't provide information over the phone or hand over personal data unless you know why it is needed. Keep a list of all account numbers in a secure place so that you have quick access if cards or documents get stolen or lost.

-- Buy a shredder for the home
Tear up or shred all credit-card receipts and all new-card offers that arrive in mail. Also destroy all documents that contain account numbers or other personal financial information.

-- Check the mail
Don't let mail sit in the mailbox for days on end. And don't place sensitive outgoing mail, such as bills, in your home mailbox to await collection. Instead, drop it in a collection box.

Sources: Federal Trade Commission, American Bankers Association

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** October 8, 2005

Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft; Visa CEO Announces New Initiative at Press Conference With Sen. Dianne Feinstein PR Newswire March 6, 2003 Thursday

6 of 9 DOCUMENTS

Copyright 2003 PR Newswire Association, Inc.
PR Newswire

**March 6, 2003 Thursday**

SECTION: WASHINGTON DATELINE

DISTRIBUTION: TO BUSINESS AND NATIONAL EDITORS

LENGTH: 774 words

HEADLINE: **Visa** USA Announces Account Truncation Initiative to Protect Consumers from ID Theft; **Visa** CEO Announces New Initiative at Press Conference With Sen. Dianne Feinstein

DATELINE: WASHINGTON March 6

BODY:

At a press conference today on Capitol Hill with Senators Dianne Feinstein (D-CA), Judd Gregg (R-NH), Jon Corzine (D- NJ) and Patrick Leahy (D-VT), **Visa** USA CEO Carl **Pascarella**, announced **Visa** USA's new account truncation program to protect consumers from identity theft. The following are excerpts of Mr. **Pascarella's** remarks:

"I am here today to talk about the steps that **Visa** is taking to put identity theft protections in place. **Visa** USA and our Member financial institutions have a long history of using state of the art technology to further protect cardholder information. **Visa** was the first payments company to adopt a zero liability policy for unauthorized purchases, and we've continued this leadership role with Verified by **Visa**, which authenticates cardholders for Internet purchases, and our sophisticated neural networks that monitor spending anomalies.

"We have also implemented our Cardholder Information Security Program, or CISP, a set of 12 requirements for protecting cardholder data for which all **Visa** payment system participants need to comply. In fact, **Visa** is adding more resources to our auditing process to ensure any entity that touches a **Visa** transaction will be compliant with our Cardholder Information Security Program rules. The CISP 'Digital Dozen' was the first set of standards within the payments industry for protecting cardholder data and served as a best practices model by the G-8 conference on cyber-crime in Tokyo.

"Today, I am proud to announce an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether. This is an added security measure for consumers that doesn't require any action by the cardholder. We are proud to be the first payments brand to announce such a move to protect cardholders' identities by restricting access to their account information on receipts.

"The first phase of this new policy goes into effect July 1, 2003 for all new terminals. I would like to add, however, that even before this policy goes into effect, many merchants have already voluntarily begun truncating receipts, thanks to groundwork that we began together several years ago.

"Receipt truncation is good news for consumers, and bad news for identity thieves. Identity thieves thrive on discarded receipts and documents containing consumers' information such as payment account numbers, addresses, Social Security numbers, and more. **Visa's** new policy will protect consumers by limiting the information these thieves can access.

"**Visa's** new receipt truncation measure builds upon our other security measures I mentioned, zero liability cardholder protection, Verified by **Visa**, neural networks and the Cardholder Information Security Program.

"Our receipt truncation policy is the latest initiative in **Visa's** broader identity theft consumer protection effort. I can't go into the details at the moment, but we will be announcing a series of additional steps to combat identity theft and offer tools to consumers.



EXHIBIT
C

Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft; Visa CEO Announces New Initiative at Press Conference With Sen. Dianne Feinstein PR Newswire March 6, 2003 Thursday

"**Visa** is focused on maintaining the trust we have earned through our security leadership. Because there is no silver bullet to eliminate identity theft, we are constantly adding new layers of security to protect cardholders. As a result of these, and many other security measures, fraud within the **Visa** system has fallen to an all-time low of just 7 cents per $100 transacted.

"**Visa** USA is pleased to be working with Senator Feinstein, and the other senators here today in the fight to protect consumers from identity theft. We look forward to continuing our joint efforts; after all, we share the same goals."

About **Visa**

**Visa** is the world's leading payment brand and largest consumer payment system, enabling banks to provide their consumer and merchant customers with a wide variety of payment alternatives. Nearly 21,000 financial institutions worldwide rely on **Visa's** processing system, VisaNet, to facilitate $2.4 trillion in annual transaction volume with virtually 100 percent reliability. Consumers in more than 150 countries carry more than one billion **Visa**-branded cards, accepted at 30 million locations around the world. Within the United States, nearly 14,000 financial institutions issue more than 385 million **Visa** cards, accounting for $970 billion in annual transaction volume. **Visa** offers a trusted, reliable and convenient way to access and mobilize financial resources -- anytime, anywhere, anyway. For more information about **Visa**, please visit http://www.**visa**.com .

SOURCE **Visa** USA

CONTACT: Adam Bromberg, +1-703-683-5004, ext. 102, for **Visa** USA

URL: http://www.prnewswire.com

LOAD-DATE: March 7, 2003



# Rules for Visa Merchants

Card Acceptance and Chargeback
Management Guidelines



EXHIBIT

D

→ SECTION FIVE: COPY REQUESTS

# Transaction Receipt Requirements—
# Card-Present Merchants

The following are Visa requirements for all transaction receipts generated from electronic point-of-sale terminals (including cardholder-activated terminals).

## *Electronic Point-of-sale Terminal Receipts*



**Merchant or member name and location, or the city and state of the Automated Dispensing Machine or Self-Service Terminal**

**Transaction Date**

**Merchant Location Code**

Effective November 1, 2005, the payment brand used to complete the transaction must be identified on the cardholder's copy of the transaction receipt.

**Authorization Code, if applicable,** except for Express Payment Service Transactions.

**Space for Cardholder Signature,** except for:
• Transactions in which the PIN is an acceptable substitute for Cardholder signature
• Limited-Amount Terminal Transactions
• Self-Service Terminal Transactions
• Express Payment Service Transactions

**Truncated Account Number**
*Visa requires that all new electronic POS terminals provide account number truncation on transaction receipts. This means that only the last four digits of an account number should be printed on the customer's copy of the receipt.*

*In addition, the expiration date should not appear at all. Existing POS terminals must comply with these requirements by July 1, 2006. To ensure your POS terminals are properly set up for account number truncation, contact your merchant bank.*

**Transaction Amount**

```
        XYZ SHOES
        1040 PARK ST
       ANYTOWN, CA 94501
     PHONE # (000)555-5555
     NOV 10, 2005   12:30PM

       MERCH ID:  08233004

     REF # : 003
     ACT # : ***********5220
     EXP   : XX/XX
     CARD  : VISA
                     $21.69
     APPROVAL CODE:    035789
     TRAN ID: VGT7ET800815

       I AGREE TO PAY ABOVE
       TOTAL AMOUNT ACCORDING
       TO CARD ISSUER AGREEMENT

     X
            SIGNATURE

          THANK YOU
        CARDHOLDER COPY
```

Rules for Visa Merchants—Card Acceptance and Chargeback Management Guidelines

©2006 Visa U.S.A. Inc., all rights reserved, to be used solely for the purpose of providing Visa Card acceptance services as authorized pursuant to agreement with a Visa member financial institution.



© 2006 Visa U.S.A. Inc.    VRM 08.12.06



## Store Locations

**Century Mall**
2828 N. Clark Street
Chicago, Illinois 60657
773-549-1833

**Stratford Square Mall**
814 Stratford Square H14
Bloomingdale, Illinois 60108
630-980-4412

**Harlem-Irving Plaza**
4136A N. Harlem Ave.
Norridge, Illinois 60706
708-456-1422

**Hawthorne Center**
718 Hawthorne Center
Vernon Hills, Illinois 60061
847-680-8615

**Chicago Ridge Mall**
510 Chicago Ridge Mall
Chicago Ridge, Illinois 60415
708-499-1121

**Gurnee Mills Mall**
6170 W. Grand Ave. #485
Gurnee, Illinois 60031
847-855-8916

**Woodfield Mall**
5 Woodfield Mall Space E302
Schaumburg, Illinois 60173
847-605-1103

**Water Tower Place**
835 N. Michigan Ave. Space #5070
Chicago, Illinois 60611
312-587-0077

**Yorktown Center**
203 Yorktown Shopping Center #265
Lombard, Illinois 60148
630-916-0995

## Corporate Office

**Gamers Paradise, Inc.**
1580 S. Milwaukee Ave. Suite 409
Libertyville, Illinois 60048

To request additional information, please feel free to contact us at:

info@gamersparadiseinc.com

© Copyright 2007, Gamers Paradise, Inc. All Rights Reserved.



EXHIBIT
E



Search

Extras



Gift Ideas

Best Sellers

General

Home
Company Info
Locations
Mailing List
Privacy Policy
Contact Us



Store

Gift
Certificates

Shipping Info
Payment Info
Returns
View Cart

## Company History

**Gamers Paradise** operates retail centers throughout Illinois with future growth considerations on a national basis. Since 1979, Gamers Paradise has offered a uniquely different shopping experience, enticing customers with our wide array of games, gifts, novelties, as well as a variety of other items.

It all began in October of 1979, when Philip Schwartzer saw a need in the marketplace and parlayed his passion for gaming into a retail business by selling board games, backgammon, chess and Dungeons & Dragons out of a small 500 square foot store front. The merchandise sold out during that first holiday season, but the idea remained and soon the little store in the Century Mall was an important stop for gamers and locals alike. From this small, but risky endeavor, Gamers Paradise was born and over the years has been nurtured and guided into grow into the business it is today.

Other retailers have tried to imitate Gamers, but they've been unable to capture our range of merchandise or our fun. From the beginning, major turning points of the company have always been based on recognizing and reacting to changing needs in the consumer market place. For example, in the early years, Gamers was purely a gaming store, but we realized we needed to change with the times. We rented video movies before there was Blockbuster, we carried music CD's when they first became available and we were one of the first retailers to demo video games. We bring to our customers an assortment that's always changing, always different, and our customers know to expect the unexpected and they keep coming back.

Today, Gamers Paradise operates a chain of stores in the Chicagoland area and we're continuing to grow. Our stores are in major metropolitan malls where our unique product mix is sure to have broad appeal. Though we've expanded far beyond just games, our long-standing commitment to ingenuity and change remains strong.

Gamers is making history and we're glad you are a part of it!

If you would like more information, please do not hesitate to contact us at:

info@gamersparadiseinc.com

© Copyright 2007, Gamers Paradise, Inc. All Rights Reserved.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEANN IOSELLO, | ) | |
| individually and on behalf of a class, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08 CV 2329 |
| | ) | Judge Der-Yeghiayan |
| GAMERS PARADISE, INC., | ) | Magistrate Judge Cole |
| and DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF DANIEL A. EDELMAN

Daniel A. Edelman declares under penalty of perjury, as provided for by the laws of the United States (28 U.S.C. §1746), that the following statements are true:

1.    Edelman, Combs, Latturner & Goodwin, LLC, has 5 principals, Daniel A. Edelman, Cathleen M. Combs, James O. Latturner, Tara L. Goodwin, and Michelle R. Teggelaar and 9 associates.

2.    **Daniel A. Edelman** is a 1976 graduate of the University of Chicago Law School. From 1976 to 1981 he was an associate at the Chicago office of Kirkland & Ellis with heavy involvement in the defense of consumer class action litigation (such as the General Motors Engine Interchange cases). In 1981 he became an associate at Reuben & Proctor, a medium-sized firm formed by some former Kirkland & Ellis lawyers, and was made a partner there in 1982. From the end of 1985 he has been in private practice in downtown Chicago. Virtually all of his practice involves litigation on behalf of consumers, mostly through class actions. He is the co-author of Rosmarin & Edelman, Consumer Class Action Manual (2d-4th editions, National Consumer Law Center 1990, 1995 and 1999); author of Payday Loans: Big Interest Rates and Little Regulation, 11 Loy.Consumer L.Rptr. 174 (1999); author of Consumer Fraud and Insurance Claims, in Bad Faith and Extracontractual Damage Claims in Insurance Litigation, Chicago Bar Ass'n 1992; co-author of Chapter 8, "Fair Debt Collection Practices Act," Ohio Consumer Law (1995 ed.); co-author of Fair Debt Collection: The Need for Private Enforcement, 7 Loy.Consumer L.Rptr. 89 (1995); author of An Overview of The Fair Debt Collection Practices Act, in Financial Services Litigation, Practicing Law Institute (1999); co-author of Residential Mortgage Litigation, in Financial Services Litigation, Practicing Law Institute (1996); author of Automobile Leasing: Problems and Solutions, 7 Loy.Consumer L.Rptr. 14 (1994); author of Current Trends in Residential Mortgage Litigation, 12 Rev. of

1



Banking & Financial Services 71 (April 24, 1996); author of Applicability of Illinois Consumer Fraud Act in Favor of Out-of-State Consumers, 8 Loy.Consumer L.Rptr. 27 (1996); co-author of Illinois Consumer Law (Chicago Bar Ass'n 1996); co-author of D. Edelman and M. A. Weinberg, Attorney Liability Under the Fair Debt Collection Practices Act (Chicago Bar Ass'n 1996); author of The Fair Debt Collection Practices Act: Recent Developments, 8 Loy.Consumer L. Rptr. 303 (1996); author of Second Mortgage Frauds, Nat'l Consumer Rights Litigation Conference 67 (Oct. 19-20, 1992); and author of Compulsory Arbitration of Consumer Disputes, Nat'l Consumer Rights Litigation Conference 54, 67 (1994).  He is a member of the Illinois bar and admitted to practice in the following courts: United States Supreme Court, Seventh Circuit Court of Appeals, First Circuit Court of Appeals, Second Circuit Court of Appeals, Third Circuit Court of Appeals, Fifth Circuit Court of Appeals, Eighth Circuit Court of Appeals, Ninth Circuit Court of Appeals, Tenth Circuit Court of Appeals, Eleventh Circuit Court of Appeals, United States District Courts for the Northern and Southern Districts of Indiana, United States District Courts for the Northern, Central, and Southern Districts of Illinois, United States District Court for the District of Arizona, United States District Court for the District of Connecticut, and the Supreme Court of Illinois.  He is a member of the Northern District of Illinois trial bar.

   **3.** **Cathleen M. Combs** is a 1976 graduate of Loyola University Law School.  She formerly supervised the Northwest office of the Legal Assistance Foundation of Chicago, where she was lead or co-counsel in class actions in the areas of unemployment compensation, prison law, social security law, and consumer law.  She joined what is now Edelman, Combs & Latturner in early 1991.  Decisions in which she was involved prior to joining the firm include: Johnson v. Heckler, 607 F.Supp. 875 (N.D.Ill. 1984), and 100 F.R.D. 70 (N.D. Ill. 1983); Sanders v. Shephard, 185 Ill.App.3d 719, 541 N.E.2d 1150 (1st Dist. 1989); Maller v. Cohen, 176 Ill.App.3d 987, 531 N.E.2d 1029 (1st Dist. 1988); Wright v. Department of Labor, 166 Ill.App.3d 438, 519 N.E.2d 1054 (1st Dist. 1988); Barron v. Ward, 165 Ill.App.3d 653, 517 N.E.2d 591 (1st Dist. 1987); City of Chicago v. Leviton, 137 Ill.App.3d 126, 484 N.E.2d 438 (1st Dist. 1985); Jude v. Morrissey, 117 Ill.App.3d 782, 454 N.E.2d 24 (1st Dist. 1983).  She is a member of the Northern District of Illinois trial bar.

   **4.** **James O. Latturner** is a 1962 graduate of the University of Chicago Law School.  Until 1969, he was an associate and then a partner at the Chicago law firm of Berchem, Schwanes & Thuma.  From 1969 to 1995 he was Deputy Director of the Legal Assistance Foundation of Chicago, where he specialized in consumer law, including acting as lead counsel in over 30 class actions.  His publications include Chapter 8 ("Defendants") in Federal Practice Manual for Legal Services Attorneys (M. Masinter, Ed., National Legal Aid and Defender Association 1989); Governmental Tort Immunity in Illinois, 55 Ill.B.J. 29 (1966); Illinois Should Explicitly Adopt the Per Se Rule for Consumer Fraud Act Violations, 2 Loy.Consumer L.Rep. 64 (1990), and Illinois Consumer Law (Chicago Bar Ass'n 1996).  He has taught in a nationwide series of 18 Federal Practice courses sponsored by the Legal Services Corporation, each lasting four days and designed for attorneys with federal litigation experience.  He has argued over 30 appeals, including two cases in the United States Supreme Court, three in the Illinois Supreme Court, and numerous cases in the Seventh, Third, Fifth, and Eleventh Circuits.  Mr. Latturner

was involved in many of the significant decisions establishing the rights of Illinois consumers. He is a member of the Northern District of Illinois trial bar.

5.    **Tara L. Goodwin** is a graduate of the University of Chicago (B.A., with general honors, 1988)and Illinois Institute of Technology, Chicago-Kent College of Law (J.D., with high honors,1991). She has been with the firm since her graduation and has participated in many of the cases described below. **Reported Cases.** Williams v. Chartwell Financial Services, LTD, 204 F.3d 748 (7th Cir. 2000); Hillenbrand v. Meyer Medical Group, 682 N.E.2d 101 (Ill.1st Dist. 1997), 720 N.E.2d 287 (Ill.1st Dist. 1999); Bessette v. Avco Fin. Servs., 230 F.3d 439 (1st Cir. 2000); Large v. Conseco Fin. Servicing Co., 292 F.3d 49 (1st Cir. 2002);; Carbajal v. Capital One, 219 F.R.D. 437 (N.D.Ill. 2004); Russo v. B&B Catering, 209 F.Supp.2d 857 (N.D.IL 2002); Garcia v. Village of Bensenville, 2002 U.S.Dist. LEXIS 3803 (N.D.Ill.); Romaker v. Crossland Mtg. Co., 1996 U.S.Dist. LEXIS 6490 (N.D.IL); Mount v. LaSalle Bank Lake View, 926 F.Supp. 759 (N.D.Ill 1996). She is a member of the Northern District of Illinois trial bar.

6.    **Michelle R. Teggelaar** is a graduate of the University of Illinois (B.A., 1993) and Chicago-Kent College of Law, Illinois Institute of Technology (J.D., with honors, 1997). **Reported Cases:** Johnson v. Revenue Management, Inc., 169 F.3d 1057 (7th Cir.1999); ; Hernandez v. Attention, LLC, 429 F. Supp. 2d 912 (N.D. Ill. 2005); Coelho v. Park Ridge Oldsmobile, Inc., 247 F. Supp. 2d 1004 (N.D. Ill. 2003); Dominguez v. Alliance Mtge., Co., 226 F. Supp. 2d 907 (N.D. Ill. 2002); Watson v. CBSK Financial Group, Inc., 197 F. Supp. 2d 1118 (N.D. Ill. 2002); Van Jackson v. Check 'N Go of Illinois, Inc. 123 F. Supp. 2d 1085 (N.D. Ill. 2000), Van Jackson v. Check 'N Go of Illinois, Inc., 123 F. Supp. 2d 1079, Van Jackson v. Check 'N Go of Illinois, Inc., 114 F. Supp. 2d 731 (N.D. Ill. 2000); Van Jackson v. Check 'N Go of Illinois, Inc., 193 F.R.D. 544 (N.D. Ill. 2000); Vines v. Sands, 188 F.R.D. 302 (N.D. Ill. 1999); Veillard v. Mednick, 24 F. Supp. 2d 863 (N.D. Ill.1998); Sledge v. Sands, 182 F.R.D. 255 (N.D. Ill. 1998), Vines v. Sands, 188 F.R.D. 203 (N.D. Ill. 1999), Livingston v. Fast Cash USA, Inc., 753 N.E.2d 572 (Ind. 2001); Binder v. Atlantic Credit and Finance, Inc., 2007 U.S. Dist. LEXIS 11483 (S.D. Ind. 2007); Carroll v. Butterfield Heath Care, Inc., 2003 WL 22462604 (N.D. Ill. 2003); Payton v. New Century Mtge., Inc., 2003 WL 22349118 (N.D. Ill. 2003); Seidat v. Allied Interstate, Inc., 2003 WL 2146825 (N.D. Ill. 2003) (Report and Recommendation); Michalowski v. Flagstar Bank, FSB, 2002 WL 112905 (N.D. Ill. 2002); Bigalke v. Creditrust Corp., 2001 WL 1098047 (N.D. Ill 2001) (Report and Recommendation); Donnelly v. Illini Cash Advance, 2000 WL 1161076 (N.D. Ill. 2000); Mitchem v. Paycheck Advance Express, 2000 WL 419992 (N.D. Ill 2000); Pinkett v. Moolah Loan Co., 1999 WL 1080596 (N.D. Ill. 1999); Farley v. Diversified Collection Serv., 1999 WL 965496 (N.D. Ill. 1999); Davis v. Commercial Check Control, 1999 WL 965496 (N.D. Ill. 1999); Sledge v. Sands, 1999 WL 261745 (N.D. Ill. 1999); Slater v. Credit Sciences, Inc., 1998 WL 341631 (N.D. Ill. 1998); Slater v. Credit Sciences, Inc., 1998 WL 299803 (N.D. Ill. 1998).

7.    **Associates**

      **a.**    **Francis R. Greene** is a graduate of Johns Hopkins University (B.A., with honors, May 1984), Rutgers University (Ph.D., October 1991), and Northwestern University Law School (J.D., 2000). **Reported Cases:** Johnson v. Thomas, 342 Ill. App.3d 382, 794 N.E.2d 919 (1st Dist. 2003); Jolly v. Shapiro & Kreisman, 237 F. Supp. 2d 888 (N.D. Ill. 2002); Parker v. 1-800 Bar None, a Financial Corp., Inc. 2002 WL 215530 (N.D. Ill. 2002); Jiang v. Allstate Ins. Co. (199 F.R.D. 267); Hill v. AMOCO Oil Co. 2003 WL 262424, 2001 WL 293628 (N.D. Ill. 2003)**;** Roquet v. Arthur Anderson LLP 2002 WL 1900768 (N.D. Ill. 2002); White v. Financial Credit, Corp. 2001 WL 1665386 (N.D. Ill.); Ransom v. Gurnee Volkswagen 2001 WL 1241297 (N.D. Ill. 2001) and 2002 WL 449703 (N.D. Ill 2002); Doxie v. Impac Funding Corp. 2002 WL 31045387 (N.D. Ill. 2002); Levin v. Kluever & Platt LLC 2003 WL 22757763 and 2003 WL 22757764 (N.D. Ill. 2003); Pleasant v. Risk Management Alternatives 2003 WL 22175390 (N.D. Ill. 2003); Jenkins v. Mercantile Mortgage 231 F. Supp. 2d 737 (N.D. Ill. 2002); Hobson v. Lincoln Ins. Agency, Inc. 2001 WL 55528, 2001 WL 648958 (N.D. Ill. 2001), Anderson v. Lincoln Ins. Agency 2003 WL 291928, Hobson v. Lincoln Ins. Agency 2003 WL 338161 (N.D. Ill. 2003); Handy v. Anchor Mortgage Corp., 464 F.3d 760 (7th Cir. 2006). He is a member of the Northern District of Illinois trial bar.

      **b.**    **Julie Clark** (nee Cobolovic) is a graduate of Northern Illinois University (B.A., 1997) and DePaul University College of Law (J.D., 2000). **Reported Cases:** Qualkenbush v. Harris Trust & Savings Bank 219 F.Supp.2d 935 (N.D.Ill.,2002); Covington-McIntosh v. Mount Glenwood Memory Gardens 2002 WL 31369747 (N.D.Ill.,2002), 2003 WL 22359626 (N.D. Ill. 2003); Ballard Nursing Center, Inc.  v. GF Healthcare Products, Inc., 2007 U.S. Dist. LEXIS 84425 (N.D. Ill. Nov. 14, 2007); Record-A-Hit, Inc. v. Nat'l. Fire Ins. Co., No. 1-07-0684, 2007 Ill. App. LEXIS 1194 (Ill. App. 1st Dist. Nov. 13, 2007).

      **c.**    **Heather A. Kolbus** (neé Piccirilli) is a graduate of DePaul University (B.S. *cum laude*, 1997), and Roger Williams University School of Law (J.D., 2002). **Reported Cases:** Clark v. Experian Info. Solutions, Inc., 2004 U.S. Dist. LEXIS 28324 (D.S.C. Jan. 14, 2004); DeFrancesco v. First Horizon Home Loan Corp., 2006 U.S. Dist. LEXIS 80718 (S.D. Ill. Nov. 2, 2006); Jeppesen v. New Century Mortgage Corp., 2006 U.S. Dist. LEXIS 84035 (N.D. Ind. Nov. 17, 2006); Benedia v. Super Fair Cellular, Inc., 2007 U.S. Dist. LEXIS 71911 (N.D. Ill. Sept. 26, 2007).

      **d.**    **Thomas E. Soule** is a graduate of Stanford University (B.A., 2000), and the University of Wisconsin Law School (J.D., 2003). **Reported Cases:** Murray v. Sunrise Chevrolet, Inc., 441 F.Supp.2d 940 (N.D. Ill. 2006); Iosello v. Leiblys, Inc., 502 F.Supp.2d 782 (N.D. Ill. 2007); Claffey v. River Oaks Hyundai, Inc., 486 F.Supp.2d 776 (N.D. Ill. 2007).

      **e.**    **Cassandra P. Miller** is a graduate of the University of Wisconsin – Madison (B.A. 2001) and John Marshall Law School (J.D. *magna cum laude* 2006). **Reported Cases:** Pietras v. Sentry Ins. Co., 513 F.Supp.2d 983 (N.D. Ill. 2007); Hernandez v. Midland Credit Mgmt., 2007 U.S. Dist. LEXIS 16054 (N.D. Ill. Sept. 25, 2007); Balogun v.

Midland Credit Mgmt., 2007 U.S. Dist. LEXIS 74845 (S.D. Ind. Oct. 5, 2007).

         **f.**     **Tiffany N. Hardy** is a graduate of Tuskegee University (B.A. 1998) and Syracuse University College of Law (J.D.2001).

         **g.**     **Zachary A. Jacobs** is a graduate of the University of South Dakota (B.S. 2002) and Chicago-Kent College of Law, Illinois Institute of Technology (J.D. 2007).

         **h.**     **Rupali R. Shah** is a graduate of the University of Chicago (B.A. 2004) and University of Illinois (J.D. *cum laude* 2007).

         **i.**     **Michael J. Aschenbrener** is a graduate of the University of Minnesota (B.A. 2001) and the Chicago-Kent College of Law, Illinois Institute of Technology (J.D. May 2007).

       **8.**     The firm also has 15 legal assistants, as well as other support staff.

       **9.**     Since its inception, the firm has recovered more than $500 million for consumers.

       **10.**     The types of cases handled by the firm are illustrated by the following:

       **11.**     **Mortgage charges and servicing practices:**  The firm has been involved in dozens of cases, mostly class actions, complaining of illegal charges on mortgages and improper servicing practices.  These include MDL-899, In re Mortgage Escrow Deposit Litigation, and MDL-1604, In re Ocwen Federal Bank FSB Mortgage Servicing Litigation, as well as the Fairbanks mortgage servicing litigation.  Decisions in the firm's mortgage cases include: Christakos v. Intercounty Title Co., 196 F.R.D. 496 (N.D.Ill. 2000); Johnstone v. Bank of America, N.A., 173 F.Supp.2d 809 (N.D.Ill. 2001); Leon v. Washington Mut. Bank, F.A., 164 F.Supp.2d 1034 (N.D.Ill. 2001);  Williamson v. Advanta Mortg. Corp., 1999 U.S. Dist. LEXIS 16374 (N.D.Ill., Oct. 5, 1999); McDonald v. Washington Mut. Bank, F.A., 2000 U.S. Dist. LEXIS 11496 (N.D.Ill., June 22, 2000); Metmor Financial, Inc. v. Eighth Judicial District Court, No. 23848 (Nev.Sup.Ct., Apr. 27, 1993); GMAC Mtge. Corp. v. Stapleton, 236 Ill.App.3d 486, 603 N.E.2d 767 (1st Dist. 1992), leave to appeal denied, 248 Ill.2d 641, 610 N.E.2d 1262 (1993); Leff v. Olympic Fed. S. & L. Ass'n, 1986 WL 10636 (N.D.Ill. 1986); Aitken v. Fleet Mtge. Corp., 1991 U.S.Dist. LEXIS 10420 (N.D.Ill. 1991), and 1992 U.S.Dist. LEXIS 1687 (N.D.Ill., Feb. 12, 1992); Poindexter v. National Mtge. Corp., 1991 U.S.Dist. LEXIS 19643 (N.D.Ill., Dec. 23, 1991), later opinion, 1995 U.S.Dist. LEXIS 5396 (N.D.Ill., April 24, 1995); Sanders v. Lincoln Service Corp., 1993 U.S.Dist. LEXIS 4454 (N.D.Ill. 1993); Robinson v. Empire of America Realty Credit Corp., 1991 U.S.Dist. LEXIS 2084 (N.D.Ill., Feb. 20, 1991); In re Mortgage Escrow Deposit Litigation, M.D.L. 899, 1994 U.S.Dist. LEXIS 12746 (N.D.Ill., Sept. 8, 1994); Greenberg v. Republic Federal S. & L. Ass'n, 1995 U.S.Dist. LEXIS 5866 (N.D.Ill.,

May 1, 1995).

**12.**    The recoveries in the escrow overcharge cases alone are over $250 million.  <u>Leff</u> was the seminal case on mortgage escrow overcharges.

**13.**    The escrow litigation had a substantial effect on industry practices, resulting in limitations on the amounts which mortgage companies held in escrow.

**14.    Bankruptcy:**  The firm brought a number of cases complaining that money was being systematically collected on discharged debts, in some cases through the use of invalid reaffirmation agreements, including the national class actions against Sears and General Electric.  <u>Conley v. Sears, Roebuck</u>, 1:97cv11149 (D.Mass); <u>Fisher  v. Lechmere Inc.</u>, 1:97cv3065, (N.D.Ill.).  These cases were settled and resulted in recovery by nationwide classes. Cathleen Combs successfully argued the first Court of Appeals case to hold that a bankruptcy debtor induced to pay a discharged debt by means of an invalid reaffirmation agreement may sue to recover the payment.  <u>Bessette v. Avco Financial Services</u>, 99-2291 (1st Cir., October 27, 2000).

**15.    Automobile sales and financing practices:**  The firm has brought many cases challenging practices relating to automobile sales and financing, including:

**a.**    Hidden finance charges resulting from pass-on of discounts on auto purchases.  <u>Walker v. Wallace Auto Sales, Inc.</u>, 155 F.3d 927, 1998 U.S. App. LEXIS 22663 (7th Cir. 1998).

**b.**    Misrepresentation of amounts disbursed for extended warranties. Taylor v. Quality Hyundai, Inc., 150 F.3d 689, 1998 U.S.App. LEXIS 16434 (7th Cir. 1998); <u>Grimaldi v. Webb</u>, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996); <u>Slawson v. Currie Motors Lincoln Mercury, Inc.</u>, 1995 U.S.Dist. LEXIS 451 (N.D.Ill., Jan. 5, 1995); <u>Cirone-Shadow v. Union Nissan, Inc.</u>, 1995 U.S.Dist. LEXIS 1379 (N.D.Ill., Feb. 3, 1995), later opinion, 1995 U.S.Dist. LEXIS 5232 (N.D.Ill., April 20, 1995) (same); <u>Chandler v. Southwest Jeep-Eagle, Inc.</u>, 1995 U.S. Dist. LEXIS 8212 (N.D.Ill., June 8, 1995); <u>Shields v. Lefta, Inc.</u>, 1995 U.S.Dist. LEXIS 7807 (N.D.Ill., June 5, 1995).

**c.**    Spot delivery.  <u>Janikowski v. Lynch Ford, Inc.</u>, 1999 U.S. Dist. LEXIS 3524 (N.D.Ill., March 11, 1999); <u>Diaz v. Westgate Lincoln Mercury, Inc.</u>, 1994 U.S.Dist. LEXIS 16300 (N.D.Ill. 1994);  <u>Grimaldi v. Webb</u>, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996).

**d.**    Force placed insurance.  <u>Bermudez v. First of America Bank Champion, N.A.</u>, 860 F.Supp. 580 (N.D.Ill. 1994); <u>Travis v. Boulevard Bank</u>, 1994 U.S.Dist. LEXIS 14615 (N.D.Ill., Oct. 13, 1994), modified, 880 F.Supp. 1226 (N.D.Ill., 1995); <u>Moore v. Fidelity Financial Services, Inc.</u>, 884 F. Supp. 288 (N.D.Ill. 1995).

**e.**    Improper obligation of cosigners.  <u>Lee v. Nationwide Cassell</u>, 174 Ill.2d 540, 675 N.E.2d 599 (1996); <u>Taylor v. Trans Acceptance Corp.</u>, 267 Ill.App.3d 562, 641 N.E.2d 907 (1st Dist. 1994), leave to appeal denied, 159 Ill.2d 581, 647 N.E.2d 1017 (1995).

**f.**    Evasion of FTC holder rule.  <u>Brown v. LaSalle Northwest Nat'l Bank</u>, 148 F.R.D. 584 (N.D.Ill. 1993), 820 F.Supp. 1078 (N.D.Ill. 1993), and 1993 U.S.Dist. LEXIS 11419 (N.D.Ill., Aug. 13, 1993).

**16.**    These cases also had a substantial effect on industry practices.  The warranty cases, such as <u>Grimaldi</u>, <u>Gibson</u>, <u>Slawson</u>, <u>Cirone-Shadow</u>, <u>Chandler</u>, and <u>Shields</u>, resulted in the Federal Reserve Board's revision of applicable disclosure requirements, so as to prevent car dealers from representing that the charge for an extended warranty was being disbursed to a third party when that was not in fact the case.

**17.    Predatory lending practices:**  The firm has brought numerous cases challenging predatory mortgage and "payday" lending practices, mostly as class actions. <u>Livingston v. Fast Cash USA, Inc.</u>, 753 N.E.2d 572 (Ind. Sup. Ct. 2001);  <u>Williams v. Chartwell Fin. Servs.</u>, 204 F.3d 748 (7th Cir. 2000); <u>Parker v. 1-800 Bar None, a Financial Corp., Inc.</u>, 01 C 4488, 2002 WL 215530 (N.D.Ill., Feb 12, 2002); <u>Gilkey v. Central Clearing Co.</u>, 202 F.R.D. 515 (E.D.Mich. 2001); <u>Van Jackson v. Check 'N Go of Ill., Inc.</u>, 114 F.Supp.2d 731 (N.D.Ill. 2000), later opinion, 193 F.R.D. 544 (N.D.Ill. 2000), 123 F.Supp. 2d 1079 (N.D.Ill. 2000), later opinion, 123 F.Supp.2d 1085 (N.D.Ill. 2000); <u>Henry v. Cash Today, Inc.</u>, 199 F.R.D. 566 (S.D.Tex. 2000); <u>Donnelly v. Illini Cash Advance, Inc.</u>, 00 C 94, 2000 WL 1161076, 2000 U.S. Dist. LEXIS 11906 (N.D.Ill., Aug. 14, 2000); <u>Jones v. Kunin</u>, 2000 U.S. Dist. LEXIS 6380 (S.D.Ill., May 1, 2000); <u>Davis v. Cash for Payday</u>, 193 F.R.D. 518 (N.D.Ill. 2000); <u>Reese v. Hammer Fin. Corp.</u>, 99 C 716, 1999 U.S. Dist. LEXIS 18812, 1999 WL 1101677  (N.D.Ill., Nov. 29, 1999); <u>Pinkett v. Moolah Loan Co.</u>, 1999 U.S. Dist. LEXIS 17276 (N.D.Ill., Nov. 1, 1999); <u>Gutierrez v. Devon Fin. Servs.</u>, 1999 U.S. Dist. LEXIS 18696 (N.D.Ill., Oct. 6, 1999); <u>Vance v. National Benefit Ass'n</u>, 99 C 2627, 1999 WL 731764, 1999 U.S. Dist. LEXIS 13846 (N.D.Ill., Aug. 26, 1999).

**18.    Other consumer credit issues:**  The firm has also brought a number of other Truth in Lending and consumer credit cases, mostly as class actions, involving such issues as:

**a.**    Phony nonfiling insurance.  <u>Edwards v. Your Credit Inc.</u>, 148 F.3d 427, 1998 U.S. App. LEXIS 16818 (5th Cir. 1998); <u>Adams v. Plaza Finance Co.</u>, 1999 U.S. App. LEXIS 1052 (7th Cir.,  January 27, 1999); <u>Johnson v. Aronson Furniture Co.</u>, 1997 U.S. Dist. LEXIS 3979 (N.D. Ill., March 31, 1997).

**b.**    The McCarran Ferguson Act exemption.  <u>Autry v. Northwest Premium Services, Inc.</u>, 144 F.3d 1037, 1998 U.S. App. LEXIS 9564  (7th Cir. 1998).

      **c.**    Loan flipping.  Emery v. American General, 71 F.3d 1343 (7th Cir. 1995).  Emery limited the pernicious practice of "loan flipping," in which consumers are solicited for new loans and are then refinanced, with "short" credits for unearned finance charges and insurance premiums being given through use of the "Rule of 78s."

      **d.**    Home improvement financing practices.  Fidelity Financial Services, Inc. v. Hicks, 214 Ill.App.3d 398, 574 N.E.2d 15 (1st Dist. 1991), leave to appeal denied, 141 Ill.2d 539, 580 N.E.2d 112; Heastie v. Community Bank of Greater Peoria,  690 F.Supp. 716 (N.D.Ill. 1989), later opinion, 125 F.R.D. 669 (N.D.Ill. 1990), later opinions, 727 F.Supp. 1133 (N.D.Ill. 1990), and 727 F.Supp. 1140 (N.D.Ill. 1990).  Heastie granted certification of a class of over 6,000 in a home improvement fraud case.

      **e.**    Arbitration clauses.  Wrightson v. ITT Financial Services, 617 So.2d 334 (Fla. 1st DCA 1993).

      **f.**    Insurance packing.  Elliott v. ITT Corp., 764 F.Supp. 102 (N.D.Ill. 1990), later opinion, 150 B.R. 36 (N.D.Ill. 1992).

      **19.**    **Automobile leases:**  The firm has brought a number of a cases alleging illegal charges and improper disclosures on automobile leases, mainly as class actions.  Decisions in these cases include Lundquist v. Security Pacific Automotive Financial Services Corp., Civ. No. 5:91-754 (TGFD) (D.Conn.), aff'd, 993 F.2d 11 (2d Cir. 1993); Kedziora v. Citicorp Nat'l Services, Inc., 780 F.Supp. 516 (N.D.Ill. 1991), later opinion, 844 F.Supp. 1289 (N.D.Ill. 1994), later opinion, 883 F.Supp. 1144 (N.D.Ill. 1995), later opinion, 1995 U.S.Dist. LEXIS 12137 (N.D.Ill., Aug. 18, 1995), later opinion, 1995 U.S.Dist. LEXIS 14054 (N.D.Ill., Sept. 25, 1995); Johnson v. Steven Sims Subaru and Subaru Leasing, 1993 U.S.Dist. LEXIS 8078 (N.D.Ill., June 9, 1993), and 1993 U.S.Dist. LEXIS 11694 (N.D.Ill., August 20, 1993); McCarthy v. PNC Credit Corp., 1992 U.S.Dist. LEXIS 21719 (D.Conn., May 27, 1992); Kinsella v. Midland Credit Mgmt., Inc., 1992 U.S.Dist. LEXIS 1405, 1992 WL 26908 (N.D.Ill. 1992); Highsmith v. Chrysler Credit Corp., 18 F.3d 434 (7th Cir. 1994); Black v. Mitsubishi Motors Credit of America, Inc., 1994 U.S.Dist. LEXIS 11158 (N.D.Ill., August 10, 1994); Simon v. World Omni Leasing Inc., 146 F.R.D. 197 (S.D.Ala. 1992).  Settlements in such cases include Shepherd v. Volvo Finance North America, Inc., 1-93-CV-971 (N.D.Ga.)($8 million benefit); McCarthy v. PNC Credit Corp., 291 CV 00854 PCD (D.Conn.); Lynch Leasing Co. v. Moore, 90 CH 876 (Circuit Court of Cook County, Illinois) (class in auto lease case was certified for litigation purposes, partial summary judgment was entered, and case was then settled); Blank v. Nissan Motor Acceptance Corp., 91 L 8516 (Circuit Court of Cook County, Illinois); Mortimer v. Toyota Motor Credit Co., 91 L 18043 (Circuit Court of Cook County, Illinois); Duffy v. Security Pacific Automotive Financial Services, Inc., 93-729 IEG (BTM) (S.D.Cal., April 28, 1994).

      **20.**    Lundquist and Highsmith are leading cases; both held that commonly-used lease forms violated the Consumer Leasing Act.  As a result of the Lundquist case, the Federal

Reserve Board completely revamped the disclosure requirements applicable to auto leases, resulting in vastly improved disclosures to consumers.

21.     **Collection practices:**  The firm has brought a number of cases under the Fair Debt Collection Practices Act, both class and individual.  Decisions in these cases include: Jenkins v. Heintz, 25 F.3d 536 (7th Cir. 1994), aff'd 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995); Johnson v. Revenue Management Corp., 169 F.3d 1057, 1999 U.S. App. LEXIS 3142 (7th Cir. 1999); Keele v. Wexler & Wexler, 1996 U.S.Dist. LEXIS 3253 (N.D.Ill., March 18, 1996) (class), 1995 U.S.Dist. LEXIS 13215 (N.D.Ill. 1995) (merits), aff'd, 149 F.3d 589, 1998 U.S.App. LEXIS 15029 (7th Cir. 1998); Mace v. Van Ru Credit Corp., 109 F.3d 338, 1997 U.S.App. LEXIS 5000 (7th Cir., Mar. 17, 1997); Maguire v. Citicorp Retail Services, Inc., 147 F.3d 232, 1998 U.S.App. LEXIS 16112 (2d Cir. 1998); Young v. Citicorp Retail Services, Inc., 1998 U.S.App. LEXIS 20268 (2d Cir. 1998); Charles v. Lundgren & Assocs., P.C., 119 F.3d 739, 1997 U.S. App. LEXIS 16786 (9th Cir. 1997); Avila v. Rubin, 84 F.3d 222 (7th Cir. 1996), aff'g Avila v. Van Ru Credit Corp., 1995 U.S.Dist. LEXIS 461 (N.D.Ill., Jan. 10, 1995), later opinion, 1995 U.S.Dist. LEXIS 1502 (N.D.Ill., Feb. 6, 1995), later opinion, 1995 U.S.Dist. LEXIS 17117 (N.D.Ill., Nov. 14, 1995);  Tolentino v. Friedman, 833 F.Supp. 697 (N.D.Ill. 1993), aff'd in part and rev'd in part, 46 F.3d 645 (7th Cir. 1995); Blakemore v. Pekay, 895 F.Supp.972 (N.D.Ill. 1995); Oglesby v. Rotche, 1993 U.S.Dist. LEXIS 15687 (N.D.Ill., Nov. 4, 1993), later opinion, 1994 U.S.Dist. LEXIS 4866 (N.D.Ill., April 15, 1994); Laws v. Cheslock, 1999 U.S.Dist. LEXIS 3416 (N.D.Ill., Mar. 8, 1999);Davis v. Commercial Check Control, Inc., 1999 U.S. Dist. LEXIS 1682 (N.D.Ill., Feb. 12, 1999); Hoffman v. Partners in Collections, Inc., 1993 U.S.Dist. LEXIS 12702 (N.D.Ill., Sept. 15, 1993); Vaughn v. CSC Credit Services, Inc., 1994 U.S.Dist. LEXIS 2172 (N.D.Ill., March 1, 1994), adopted, 1995 U.S.Dist. LEXIS 1358 (N.D.Ill., Feb. 3, 1995); Beasley v. Blatt, 1994 U.S.Dist. LEXIS 9383 (N.D.Ill., July 14, 1994); Taylor v. Fink, 1994 U.S.Dist. LEXIS 16821 (N.D.Ill., Nov. 23, 1994); Gordon v. Fink, 1995 U.S.Dist. LEXIS 1509 (N.D.Ill., Feb. 7, 1995); Brujis v. Shaw, 876 F.Supp. 198 (N.D.Ill. 1995). Settlements in such cases include Boddie v. Meyer, 93 C 2975 (N.D.Ill.); and Cramer v. First of America Bank Corporation, 93 C 3189 (N.D.Ill.).

22.     Jenkins v. Heintz is a leading decision regarding the liability of attorneys under the Fair Debt Collection Practices Act.  I argued it before the Supreme Court and Seventh Circuit.  Avila v. Rubin is a leading decision on phony "attorney letters."

23.     **Fair Credit Reporting Act:** The firm has filed numerous cases under the Fair Credit Reporting Act, primarily as class actions.  One line of cases alleges that lenders and automotive dealers, among others, improperly accessed consumers' credit information, without their consent and without having a purpose for doing so permitted by the FCRA.   Important decisions in this area include: Cole v. U.S. Capital, Inc., 389 F.3d 719 (7th Cir. 2004), Murray v. GMAC Mortgage Corp., 434 F.3d 948 (7th Cir. 2006); Perry v. First National Bank, 459 F.3d 816 (7th Cir. 2006); Murray v. Sunrise Chevrolet, Inc., 441 F. Supp.2d 940 (N.D. Ill. 2006); Murray v. GMAC Mortgage Corp., 05 C 1229, _____ F.Supp.2d _____, 2007 U.S. Dist. LEXIS 26726 (N.D.Ill. April 10, 2007); Shellman v. Countrywide Home Loans, Inc., 1:05-CV-234-TS, 2007

U.S. Dist. LEXIS 27491 (N.D.Ind.,  April 12, 2007); In re Ocean Bank, 06  C 3515, 2007 U.S. Dist. LEXIS 28973 (N.D.Ill., March 16, 2007), later opinion,  2007 U.S. Dist. LEXIS 29443 (N.D. Ill., Apr. 9, 2007); Asbury v. People's Choice Home Loan, Inc., 05 C 5483, 2007 U.S. Dist. LEXIS 17654 (N.D.Ill., March 12, 2007); Claffey v. River Oaks Hyundai, Inc., 238 F.R.D. 464 (N.D.Ill. 2006); Murray v. IndyMac Bank, FSB, 461 F.Supp.2d 645 (N.D.Ill. 2006); Kudlicki v. Capital One Auto Finance, Inc., 2006 U.S. Dist. LEXIS 81103 (N.D. Ill., Nov. 2, 2006); Thomas v. Capital One Auto Finance, Inc., 2006 U.S. Dist. LEXIS 81358 (N.D. Ill., Oct. 24, 2006); Pavone v. Aegis Lending Corp., 2006 U.S. Dist. LEXIS 62157 (N.D. Ill., Aug. 31, 2006); Murray v. E*Trade Financial Corp., 2006 U.S. Dist. LEXIS 53945 (N.D. Ill., July 19, 2006); Bonner v. Home 123 Corp., 2006 U.S. Dist. LEXIS 37922 (N.D. Ind., May 25, 2006); Murray v. Sunrise Chevrolet , Inc., 2006 U.S. Dist. LEXIS 19626 (N.D. Ill., Mar. 30, 2006); and Murray v. Finance America, LLC, 2006 U.S. Dist. LEXIS 7349 (N.D. Ill., Jan 5, 2006).  More than 15 such cases have been settled on a classwide basis.

24.    **Class action procedure:**  Important decisions include Crawford v. Equifax Payment Services, Inc., 201 F.3d 877 (7th Cir. 2000); Blair v. Equifax Check Services, Inc., 181 F.3d 832 (7th Cir. 1999); Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997); and Gordon v. Boden, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991).

25.    **Landlord-tenant:**  The firm has brought a number of class actions against landlords for failing to pay interest on security deposits or commingling security deposits.

26.    Some of the other reported decisions in our cases include:  Elder v. Coronet Ins. Co., 201 Ill.App.3d 733, 558 N.E.2d 1312 (1st Dist. 1990); Smith v. Keycorp Mtge., Inc., 151 Bankr. 870 (N.D.Ill. 1992); Gordon v. Boden, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991), leave to appeal denied, 144 Ill.2d 633, 591 N.E.2d 21, cert. denied, U.S. (1992); Armstrong v. Edelson, 718 F.Supp. 1372 (N.D.Ill. 1989); Newman v. 1st 1440 Investment, Inc., 1993 U.S.Dist. LEXIS 354 (N.D.Ill. 1993); Mountain States Tel. & Tel. Co. v. District Court, 778 P.2d 667 (Colo. 1989); Disher v. Fulgoni, 124 Ill.App.3d 257, 464 N.E.2d 639, 643 (1st Dist. 1984); Harman v. Lyphomed, Inc., 122 F.R.D. 522 (N.D.Ill. 1988); Haslam v. Lefta, Inc., 1992 U.S.Dist. LEXIS 3623 (N.D.Ill., March 25, 1994); Source One Mortgage Services Corp. v. Jones, 1994 U.S.Dist. LEXIS 333 (N.D.Ill., Jan. 13, 1994).

27.    Gordon v. Boden is the first decision approving "fluid recovery" in an Illinois class action.  Elder v. Coronet Insurance held that an insurance company's reliance on lie detectors to process claims was an unfair and deceptive trade practice.

_____
Daniel A. Edelman

Edelman, Combs, Latturner & Goodwin, LLC
120 S. LaSalle Street, 18th Floor

10

Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)